# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Ramon Vasquez,                :
                   Appellant     :
                                :
            v.                 :      No. 1011 C.D. 2020
                                :      Submitted: March 25, 2022
                                :
Berks County, Janine Quigley,    :
Jeffrey Smith, Jay Phillips,       :
Miguel Castro, Stephen Dew,     :
Michael Johnson, Charles Fisher,  :
Dustin Remp, Sgt. Tassone and    :
CO Matta                         :

BEFORE:    HONORABLE RENÉE COHN JUBELIRER, President Judge
                   HONORABLE MICHAEL H. WOJCIK, Judge
                   HONORABLE LORI DUMAS, Judge

OPINION BY
PRESIDENT JUDGE COHN JUBELIRER          FILED: June 29, 2022

Ramon Vasquez (Vasquez), pro se, appeals from the Court of Common Pleas of Berks County's (trial court) March 23, 2018 Order that sustained the Preliminary Objections (POs) filed by Berks County, Janine Quigley (Quigley), Jeffrey Smith (Smith), Jay Phillips (Phillips), Miguel Castro (Castro), Stephen Dew (Dew), Michael Johnson (Johnson), Charles Fisher (Fisher), Dustin Remp (Remp), Sgt. Tassone (Tassone), and CO Matta (Matta) (collectively, Appellees[1]) and dismissed Vasquez's Amended Complaint with prejudice. In the Amended Complaint, Vasquez sought damages under 42 U.S.C § 1983[2] (Section 1983), alleging violations

---

[1] Vasquez also included claims against Fernando Torres, who was not a listed defendant to this action. It is not clear from the record whether service on Torres was ever effectuated.

[2] Section 1983 provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to

**(Footnote continued on next page…)**

of Vasquez's constitutional rights and state law tort claims based on Appellees' actions during Vasquez's incarceration in the Disciplinary Segregation Unit (Delta Unit) at the Berks County Jail from 2014 to 2015. On appeal,[3] Vasquez argues that he successfully stated claims for: (1) First Amendment retaliation[4] against Dew and Johnson; (2) excessive force against Johnson; (3) failure to intervene against Dew; (4) *Monell*[5] liability against Berks County and Quigley; and (4) his conditions of confinement claim concerning inadequate exercise against Berks County and Quigley. Vasquez also argues that, because Appellees' POs failed to challenge: (1) his retaliation claims against the remaining Appellees; (2) his failure to protect claim against Quigley, Smith, Phillips, and Castro; (3) his due process claims; and (4) his tort claims, the trial court erred in dismissing those unobjected-to claims.

---

be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983.

[3] We have reorganized the issues raised by the parties for ease of discussion.

[4] Vasquez brought his retaliation claims under both the First Amendment to the United States Constitution, U.S. CONST. amend. I, and article I, section 7 of the Pennsylvania Constitution, PA. CONST. art. I, § 7. For purposes of this opinion, "First Amendment retaliation" refers to both constitutional provisions.

[5] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

# I. BACKGROUND

## A. *Amended Complaint*

Vasquez filed his original complaint with the trial court in January 2017 against some of the named Appellees.[6]  After the then-named Appellees filed an Answer and New Matter, Vasquez filed the operative Amended Complaint, adding the remaining Appellees.

### 1. Delta Unit and Conditions of Confinement

In the Amended Complaint, Vasquez alleged that he was confined at the Berks County Jail and placed on Disciplinary Segregation status in the Delta Unit, which is "a secured unit where[] Vasquez was confined to his cell 23 hours a day." (Amended (Am.) Complaint (Compl.) ¶ 6, Original Record (O.R.) Item 9.)  Vasquez explained that, "per [the] [I]mate [H]andbook[,] there were [sic] a set list of restrictions as part of the conditions of confinement for [Disciplinary] Segregation[7] [] status." (*Id.* (citing Original (Orig.) Compl. Exhibit (Ex.) 1, O.R. Item 12).)[8]  The

---

[6] Vasquez's initial complaint named Berks County, Quigley, Smith, Phillips, Castro, Dew, Johnson, Fisher, and Remp.  The Amended Complaint added Tassone and Matta.

[7] While Vasquez points to the list of restrictions for Administrative Segregation, the Inmate Handbook also contains a list of restrictions for Disciplinary Segregation, which is the designation of Vasquez's alleged restrictions.  (Original Complaint Exhibit (Ex.) 1 at 22-23.)

[8] Vasquez attempts to incorporate by reference to the Original Petition the following exhibits attached thereto:  Exhibits 1 (Inmate Handbook); 2 (Clothing List Available to Inmates); 3 (Administrative Grievances concerning Dew from 2014); 4 (Unit Action from Dew, Administrative Grievances concerning the January 8, 2015 incident, and Witness Statements concerning same); 5 (Berks County Jail Rules and Regulations); 6 (Delta Unit Inmate Orientation Acknowledgement form); 7 (Unit Action concerning the January 27, 2015 incident with Dew and resulting Administrative Grievances); 9 (Administrative Grievances concerning laundry and kosher meals); 10 (Witness Statements concerning kosher meals); 11 (Administrative Grievances concerning exercise); 12 (Institutional Classification Committee (ICC) Report concerning the April 2, 2015 Hearing); 13 (Administrative Grievance and Appeal concerning conditions of confinement); 14 (Witness Statements concerning harassment from Johnson and Dew and the food **(Footnote continued on next page…)**

3

Inmate Handbook, attached to the Original Complaint as Exhibit 1, indicates that these restrictions include: one hour of out-of-cell exercise, which may be further restricted; restrictions on showers, clothing, mattress, blankets, and pillows; food loaf for each meal Monday through Friday; restrictions on privileges and participation in programs and services; no use of the inmate telephone system; and limitations on books, restricting those in the Delta Unit to one generic book, one religious book, and one law book. (Orig. Compl. Ex. 1 at 22-23.) Vasquez further alleged that he was restricted to one inch of legal material. Vasquez asserted that this was a "silent policy" not contained in any of the handbooks or rules provided to him, that served "no legitimate penological interest," "was excessive in light of managing and maintaining order and security," and "was designed as a form of

loaf incident with Fisher and Remp); 15 (Administrative Grievance and Appeal concerning the food loaf incident with Fisher and Remp); 16 (Administrative Grievance concerning Dew's confiscation of legal materials); 17 (ICC Report from July 25, 2015 Hearing concerning the rule restricting Vasquez to one inch of legal material); 18 (Administrative Grievance concerning Dew's confiscation of legal materials); 19 (Unit Action from Johnson indicating that Vasquez had two mattresses); 20 (Administrative Grievance concerning the Unit Action from Johnson); 21 (Appeal from Administrative Grievance concerning the Unit Action from Johnson); 22 (ICC Report from July 23, 2015 hearing); 23 (Administrative Grievance concerning July 28, 2015 incident with Dew); 24 (Administrative Grievance concerning Dew's confiscation of legal materials); 25 (Appeal from denial of Administrative Grievance concerning Dew's confiscation of legal materials and ICC Report from August 20, 2015 hearing concerning kosher meals and legal materials); 26 (Unit Action from Johnson); 27 (Witness Statements concerning the August 17, 2015 incident with Dew and Johnson); 28 (Administrative Grievance concerning the August 17, 2015 incident with Dew and Johnson); 29 (Appeal from denial of Administrative Grievance concerning the August 17, 2015 incident with Dew and Johnson); 33 (Administrative Grievances concerning Fisher and kitchen staff); 35 (Unit Action from Dew and ICC Report from November 12, 2015 hearing); and 36 (Administrative Grievance concerning November 2015 incident where Due confiscated legal materials) (*See* Am. Compl. ¶¶ 6, 10, 13-14, 17-18, 23-24, 26, 27-35, 37-39, 42-44.) Some of the Original Complaint exhibits to which Vasquez cites in the Amended Complaint are duplicative and have not been listed.

Recognizing that pro se litigants are held to more lenient standards and not the stringent standards expected of pleadings drafted by lawyers, *Madden v. Jeffes*, 482 A.2d 1162, 1165 (Pa. Cmwlth. 1984), these exhibits were adequately incorporated in the Amended Complaint.

4

punishment and a way to withhold Vasquez from reasonably accessing the courts to litigate his cases." (Am. Compl. ¶¶ 9, 32, 35.)

Vasquez asserted numerous allegations surrounding his conditions of confinement. Relevantly, Vasquez alleged claims surrounding his access to exercise. Vasquez averred that, pursuant to a policy adopted and imposed by Quigley and Berks County, he "would be placed outside for his hour of recreation with his standard uniform[,] a sweater and hospital [shoes] to face the harsh wintery weather." (*Id.* ¶¶ 10, 57.) On days that it snowed, Vasquez asserted, he "would be afforded indoor recreation but would be shackled in handcuffs to a belt for [the] exercise time." (*Id.* ¶ 10.) Vasquez submitted a grievance for this issue but received no relief. (*Id.*; *see also* Orig. Compl. Ex. 11 at 3.) Vasquez maintained that "[t]his was another policy or custom designed to punish and deter Vasquez from taking recreation" and that the refusal "to provide adequate clothing for these conditions" and restrictions on Delta Unit prisoners purchasing warmer clothing were other "form[s] of punishment within the conditions of confinement." (Am. Compl. ¶ 10 (citing Orig. Compl. Ex. 2).) Because of these alleged restrictions, Vasquez suffered an aggravation of a preexisting injury to his right arm, "reoccurring nightmares, and mental/emotional problems," which resulted in him being placed on suicide watch. (Am. Compl. ¶¶ 21, 25 (citing Orig. Compl. Ex. 11).)

2. First Amendment Retaliation Claim Against Dew

Vasquez alleged numerous instances of retaliatory abuse from Dew. Vasquez contended that, while there were "three officers assigned to Delta Unit at [a] time who were responsible for the daily operations of managing the unit," including Fisher and Remp, "Dew was not even a formal correctional officer" but a "special operations group[ (S.O.G.)] member" who was responsible for "emergency response

5

situations for increased safety." (*Id.* ¶ 12.) Vasquez averred that "Dew had an adverse history of retaliating and harassing Vasquez for utilizing the grievance system against Dew for official misconducts," "would regularly confiscate and destroy Vasquez's legal materials, and [would] issue trumped up misconducts to justify [Dew's] harassment." (*Id.* ¶ 13.) Vasquez submitted a grievance about Dew's conduct to Quigley and Castro but received no relief. (*Id.* (citing Orig. Compl. Ex. 3).) The documents attached as Exhibit 3 show that Vasquez first complained that Dew confiscated his legal materials on July 9, 2014, and his appeal from the denial of that grievance, and also include a purported affidavit describing the same conduct by Dew. (Orig. Compl. Ex. 3.)

Vasquez asserted that on the morning of January 8, 2015, Vasquez "was removed from his cell for his hour of recreation. Upon return[,] he witnessed [] Dew emerge from his cell alone with a bundle of papers and a Styrofoam tray." (Am. Compl. ¶ 11.) During that incident, Dew "confiscated and destroyed Vasquez's affidavit [for] his pending criminal case" that morning. (*Id.* ¶ 14.) When Vasquez noticed the document was missing the subsequent morning while preparing for court, Vasquez "requested to speak to a supervisor." (*Id.*) Vasquez asserted that a S.O.G. sergeant came to speak with Vasquez, and Vasquez informed the sergeant about the incident and "that it was a continuous problem with Dew taking and destroying his legal material." (*Id.*) The S.O.G. sergeant told Vasquez that there was nothing he could do and advised submitting a grievance, which Vasquez did on January 9, 2015, including verified statements from two witnesses. (*Id.* (citing Orig. Compl. Ex. 4).) Phillips, a lieutenant at the Berks County Jail, denied the grievance on the basis that Dew denied the events, and Quigley dismissed the appeal due to a lack of evidence. (*Id.* ¶ 15.)

6

After submitting the grievance, Vasquez alleged that Dew "came by [his] cell and began to antagonize him," stating, "'[y]ou're wasting your time with those grievances, this isn't Philadelphia[.] [W]e do things a little different in Berks County.'" (*Id.*) Vasquez asserted that Dew said so "as an intimidating statement to deter Vasquez of ordinary firmness from utilizing the grievance system." (*Id.*)

Next, Vasquez alleged that on January 27, 2015, Vasquez "noticed Dew alone again searching inmates['] cells while they were out for their hour of recreation." (*Id.* ¶ 16.) Accordingly, Vasquez declined recreation due to his fear that Dew would confiscate and destroy his legal materials. Vasquez averred that Dew then returned, searched Vasquez's cell, and Vasquez told Dew not to touch his legal work. Thereafter, Dew cited only Vasquez with a unit action and placed only Vasquez "on [a] seven[-]day mattress restriction[9] for the same nuisance items found in every other inmate['s] cell." (*Id.*) Vasquez maintained that the rules and regulations only provided for unit sanctions from unit officers and mattress restrictions were not among the unit sanctions nor was Dew a unit officer. (*Id.* ¶ 17 (citing Orig. Compl. Ex. 5).) Vasquez filed another grievance for this issue but received no relief. (*Id.* ¶¶ 18-19 (citing Orig. Compl. Exs. 4, 7).)

Vasquez next alleged a similar incident in early June 2015, after he had just received a final appeal decision concerning grievances against Fisher and Remp on June 5, 2015. (Orig. Compl. Ex. 15.) After Dew ordered Vasquez out of his cell stating, "'Let's see what I can get today,' he then confiscated Vasquez's legal material" for being over the allowable amount, one inch. (Am. Compl. ¶ 31 (citing Orig. Compl. Ex. 16).) Vasquez alleges that there is no "one-inch rule" in any of the rules or handbooks provided to him and that he raised this with Berks County Jail's

---

[9] It is unclear from the Amended Complaint exactly what a "mattress restriction" entails.

7

Institutional Classification Committee (ICC). (*Id.* ¶ 32.) The ICC holds hearings every 30 days at which inmates may bring complaints and forwards the records thereof to Quigley. (*Id.* ¶ 20.) The ICC informed him he was only allowed one inch of legal material and to ask to exchange materials when needed. Vasquez alleged that "he would not get the correct paperwork" when requested and that "this would be another form of punishment . . . in excess [of] prison interest designed to retaliate for filing grievances and withhold him from access to the courts." (*Id.* ¶ 32 (citing Orig. Compl. Exs. 17-18).)

Finally, Vasquez asserted that on July 28, 2015, after he asked for a new meal because the one provided to him was wrong, Dew came by his cell and, again, confiscated his legal work and issued him a misconduct, which was subsequently dismissed. (*Id.* ¶ 35 (citing Orig. Compl. Ex. 23).) Vasquez alleged that he eventually received the correct meal after speaking with a sergeant, but his legal materials were never returned. Based on these allegations, Vasquez claimed that Dew's conduct in confiscating and destroying his legal materials constituted unconstitutional retaliation, violating his rights under both the United States and Pennsylvania Constitutions.[10] (*Id.* ¶ 46.) Vasquez further alleged that this conduct violated his due process rights under the Fourteenth Amendment to the United States Constitution.[11] (*Id.* ¶ 58.)

---

[10] The First Amendment to the United States Constitution provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof, or abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. CONST. amend. I. Section 7 of article I to the Pennsylvania Constitution states, in pertinent part: "The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty." PA. CONST. art. I, § 7.

[11] Section 1 of the Fourteenth Amendment to the United States Constitution provides, in relevant part, that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1.

3.  First Amendment Retaliation and Due Process Claims against Johnson

Vasquez next asserted a First Amendment retaliation claim against Johnson concerning allegedly arbitrary unit actions in the form mattress restrictions. On July 18, 2015, just after finishing seven days of mattress restriction, Vasquez alleged Johnson came to his cell and ordered him to surrender his mattress. (*Id.* ¶ 33.) After informing Johnson that he finished a seven-day restriction, "Johnson told Vasquez that he didn't care what the paper said[ and] that if he tells [Vasquez] he wanted the mattress[, then Vasquez should] just shut up and do as he's told." (*Id.*) Johnson then cited Vasquez with a unit action that stated he had two mattresses. (*Id.* (citing Orig. Compl. Ex. 19).) Vasquez filed a grievance, which Castro denied, finding that Vasquez did have two mattresses. (*Id.* (citing Orig. Compl. Ex. 20).) Vasquez appealed, arguing that the mattress restriction was an arbitrary punishment not within the rules and regulation of the Inmate Handbook, but Smith denied the appeal. (*Id.* (citing Orig. Compl. Ex. 21).) Vasquez asserted that Johnson's conduct constituted unconstitutional First Amendment retaliation against his ongoing use of the grievance system, and a Fourteenth Amendment due process violation. (*Id.* ¶¶ 47, 59.)

4.  Excessive Force and Tort Claims against Johnson and Failure to Intervene and Tort Claims against Dew

Vasquez next asserted excessive force and tort claims against Johnson and Dew in regard to an alleged incident on August 17, 2015. Vasquez asserted that while "Dew and Johnson were conducting cell searches, Dew ordered Vasquez to cuff up," and he complied. (*Id.* ¶ 37.) When a fellow inmate asked Vasquez what was happening, he said "'these guys are on their b.s. again.'" (*Id.*) In response, Johnson stated "'you know what[,] I'm tired of your shit' and then placed a black bag over Vasquez's head filled with pepper spray and yelled at Vasquez to get on

9

his knees." (*Id.*) Vasquez complied with the order to get on his knees, "began coughing[,] and stated his eyes were burning," and, after Vasquez asked why he was being treated like this, Dew stated, "don't cry now[,] you wan[t to] play games[,] we know how to play games too." (*Id.*) Vasquez "remained in that position for several minutes coughing and gasping for air." (*Id.*) After a sergeant appeared and Vasquez inquired as to Dew and Johnson's presence, the sergeant noted that "neither Dew nor Johnson were the unit officers that evening" and ordered that Vasquez be returned to his cell and that the spit hood be taken off of Vasquez's head. (*Id.*) Vasquez then washed his eyes and face to remove the remnants of pepper spray, did not receive any medical attention, was cited for a unit action by Johnson, and placed on a seven-day mattress restriction. (*Id.* (citing Orig. Compl. Ex. 26).) Vasquez alleged that six witnesses provided witness statements verifying this incident and that the incident was captured by video surveillance. (*Id.* (citing Orig. Compl. Ex. 27).) Vasquez filed a grievance on this issue, which Phillips denied on the basis that Dew and Johnson's actions were justified where Vasquez was verbally abusive, and his actions could have escalated into combative behavior threatening officer safety. (*Id.* (citing Orig. Compl. Ex. 28).) Based on these allegations, Vasquez asserted an excessive force claim in violation of the Eighth Amendment[12] and assault and battery tort claims against Johnson for placing the spit hood containing pepper spray over his head, and he asserted Eighth Amendment failure to act/intervene and negligence claims against Dew for his compliance and participation in the conduct. (*Id.* ¶¶ 52-53.)

---

[12] The Eighth Amendment to the United States Constitution provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. CONST. amend. VIII.

### 5. First Amendment Retaliation Claims against Tassone and Matta

Vasquez also alleged First Amendment retaliation claims against Tassone and Matta concerning grievances he filed regarding the kosher meals provided to him. Vasquez explained that Tassone and Matta "were the kitchen officers who overs[aw] the kosher meals" and that Vasquez "initially [] receive[d] whole fruits and vegetables along with a T.V.[-]styled dinner as a main course." (*Id.* ¶ 23.)

Vasquez alleged that, on February 13, 2015, Vasquez "submitted a communication request form to the kitchen requesting a copy of the menu"; however, Matta allegedly responded that Vasquez "did not need to know what was on the menu." (*Id.* (citing Am. Compl. Ex. C).) After attempting to reach out to other departments of the facility regarding the kosher menu without success, Vasquez alleged that the meals became half the size and "changed from the above mentioned to outdated canned food products." (*Id.* ¶¶ 23-24 (citing Am. Compl. Ex D; Orig. Compl. Ex. 9 at 4).) Vasquez maintained that this was in retaliation to requesting a kosher menu and he filed a grievance, but again he received no relief because, per Tassone and Smith, the portions were approved by the chaplain, though Smith did admit that a mistake was made as to one of the meals, which was corrected. (*Id.* ¶ 24 (citing Am. Compl. Ex. E).) Afterwards, Vasquez alleged that the size of the meals became smaller. Vasquez filed another grievance, including statements from other inmates indicating that "Tassone, Matta, and other officers made final decisions on the meals," that "the kosher microwavable dinners and fresh fruits [that] were for inmates were instead given to officers," that "both Tassone and Matta were overheard making adverse remarks about the kosher meals and inmates on Delta Unit," and that "there was a constant change in the [k]osher meals for no reason." (*Id.* ¶ 26 (citing Orig. Compl. Ex. 10).) After raising his concerns about the kosher

11

meals to the ICC, Vasquez alleges that the ICC "conceded the institution's use of food as a punishment by stating that the kosher protein may be different" for those on disciplinary watch. (*Id.* ¶ 27 (citing Orig. Compl. Ex. 12).) Based on these allegations, Vasquez maintained that Tassone and Matta engaged in unconstitutional First Amendment retaliation for utilizing the grievance system by continuously depriving him of the full kosher meals. (*Id.* ¶¶ 36, 48.)

6. First Amendment Retaliation, Excessive Force, and Tort Claims against Fisher and Remp

Vasquez next alleged Fisher and Remp were two of the three regular officers assigned to the Delta Unit who retaliated against him for his use of the grievance system in regard to his legal materials and began to antagonize him about the issue. (*Id.* ¶¶ 12, 32.) Vasquez asserted that on May 11, 2015, he asked Fisher and Remp for any breakfast leftovers if available, and Fisher responded in the negative and said to Remp, "'this guy has this thing mistaken with these kosher meals, he wants extras too.'" (*Id.* ¶ 29.) Remp responded, "'what does he [think] this is[,] the Holiday Inn[?]'" (*Id.*) A few minutes later, Fisher returned to Vasquez's cell and gave him a food loaf. "After Vasquez began to eat the food[ ]loaf[,] he noticed a yellowish film on the wax bag it came in[.] He then inspected i[t] by smelling it[,] and it smelled like urine." (*Id.*) After spitting out the food loaf and yelling at Fisher and Remp, the two "began to laugh, then Remp stated, 'put a piss slip on that one.'" (*Id.*) Vasquez asserted that two witnesses provided verified statements as to this incident. (*Id.* (citing Orig. Compl. Ex. 14).) Vasquez filed a grievance for this incident, alleging that this conduct was retaliation for his earlier grievances concerning kosher meals, which Phillips denied, and Quigley upheld based on Fisher and Remp denying that the incident took place. (*Id.* ¶ 30 (citing Orig. Compl. Ex. 15).) Based on these averments, Vasquez asserted First Amendment retaliation, Eighth

12

Amendment cruel and unusual punishment, and battery and assault tort claims against Fisher and Remp. (*Id.* ¶¶ 51, 54.)

7. First Amendment Retaliation, Failure to Protect, Supervisory Liability, Due Process, and Tort Claims against Quigley, Smith, Castro, and Phillips

For their participation in denying grievances and appeals and participating in ICC hearings where Vasquez brought his concerns regarding his conditions of confinement relating to the adequacy of the exercise provided, the denial of kosher meals, and the continual confiscation and destruction of his legal materials, Vasquez alleged that Quigley, Smith, Castro, and Phillips all exercised deliberate indifference to their subordinates' conduct. Vasquez asserted that the record "demonstrated personal involvement after being aware of a chronology of events" showing "a substantial risk of subordinates['] adverse action" in response to "his protected right" of filing grievances. (*Id.* ¶ 49.) Vasquez also contended that their deliberate indifference permitted the subordinate Appellees to violate his First Amendment rights and violated the prohibition against the imposition of cruel and unusual punishment by not protecting Vasquez from the use of excessive force or from the imposition of unconstitutional conditions of confinement. (*Id.* ¶ 55.) Vasquez alleged that this conduct violated his due process rights under the Fourteenth Amendment and his right to be free from cruel and unusual punishment under the Eighth Amendment and also constituted the torts of negligence, supervisory liability, intentional infliction of emotional distress,[13] and a civil conspiracy. (*Id.* ¶¶ 49, 55, 61, 63.)

---

[13] Vasquez brought his intentional infliction of emotional distress claim against all Appellees.

13

8.  First Amendment, *Monell*, Eighth Amendment, and Due Process, and Tort Claims against Berks County

Finally, Vasquez asserted First Amendment, *Monell*, Eighth Amendment, due process, and tort claims against Berks County for allegedly adopting policies that condoned or overlooked the conduct of subordinate Appellees, focusing again on his conditions of confinement relating to exercise, the denial of kosher meals, and the continual confiscation and destruction of his legal materials. Vasquez alleged that Berks County "adopted a custom or policy with deliberate indifference [that] failed to take necessary reasonable standards to provide care or safeguard Vasquez's right to free[ ]speech without retaliation from malicious[,] ill-trained prison officials" and that its "acqui[e]scence was the moving force [that] caused the breach of duty." (*Id.* ¶ 50.) Accordingly, Vasquez asserted that Berks County violated the First Amendment and the Pennsylvania Constitution and was indirectly liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).[14] Vasquez further alleged claims against Berks County based on negligence under the theory of respondeat superior, an Eighth Amendment violation, and a due process violation. (Am. Compl. ¶¶ 50, 56, 62.)[15]

B. *POs and the Trial Court's 1925(a) Opinion*

Appellees filed POs to the Amended Complaint in the nature of demurrers, asserting that certain of Vasquez's claims failed as a matter of law. (Preliminary

---

[14] While the Amended Complaint did not cite to *Monell*, paragraph 50 employs the *Monell* standard for municipal liability, and Vasquez argues this claim under *Monell* on appeal. (*See* Am. Compl. ¶ 50.) Given the lenient pleading rules for pro se inmates and that Appellees addressed the claim as being pleaded under *Monell*, we accept this claim as being brought under the same. *Madden*, 482 A.2d at 1165.

[15] With respect to damages, Vasquez requested compensatory damages against all Appellees in the amount of $240,000, compensatory damages against Berks County, Quigley, Smith, Phillips, and Castro for $95,000, and any other damages the Court deems just. (Am. Compl. at 29-30.)

Objections (POs), O.R. Item 16.) First, Appellees demurred to the First Amendment claims, arguing that Vasquez failed to plead sufficient facts to support a claim that any of the Appellees serving as staff of Berks County Jail engaged in retaliatory conduct towards him or that such conduct deterred him from filing grievances. (POs ¶¶ 120-29.) Second, they demurred to the excessive force claim under the Eighth Amendment, asserting that Vasquez's allegations surrounding the use of the spit hood did not shock the conscience. (*Id.* ¶¶ 130-50.) Third, Appellees demurred to the conditions of confinement claim under the Eighth Amendment concerning Vasquez's mattress restrictions, limitations on personal belongings, exercise conditions, and food quality, arguing that the conditions described were reasonable measurements to ensure the security and safety of the institution in light of Vasquez's security designation in the Delta Unit and that the food loaf provided did not constitute the denial of minimal necessities. (*Id.* ¶¶ 151-77.) Fourth, they demurred to the failure to intervene claim, contending that Vasquez failed to plead a constitutional violation giving rise to any officers' duty to intervene. (*Id.* ¶¶ 178-88.) Finally, Appellees demurred to the *Monell* liability claims, arguing that Vasquez failed to prove an underlying constitutional violation, any deficient custom, practice, or policy that caused a violation, or that there was any pattern of similar incidents and circumstances of the same. (*Id.* ¶¶ 189-210.)

After Vasquez filed an Answer to the POs and briefing, the trial court sustained the POs and dismissed Vasquez's Amended Complaint in its entirety with prejudice. Vasquez appealed[16] and filed a Concise Statement of Errors Complained

---

[16] Vasquez filed a Petition for Reconsideration/Or Direct Appeal Rights *Nunc Pro Tunc* (First Petition), contesting the trial court's decision and asserting entitlement to *nunc pro tunc* relief. After the First Petition was denied, Vasquez filed a second Petition for Leave to Appeal *Nunc Pro Tunc* (Second Petition), which the trial court also denied. On appeal from that denial, **(Footnote continued on next page…)**

of on Appeal pursuant to Pennsylvania Rule of Appellate Procedure 1925(b), Pa.R.A.P. 1925(b).[17] (O.R. Item 85.) The trial court then filed its opinion pursuant to Pennsylvania Rule of Appellate Procedure 1925(a) (1925(a) Opinion), Pa.R.A.P. 1925(a). (O.R. Item 87; Vasquez's Brief (Br.) Appendix A.)

The trial court issued its 1925(a) Opinion on January 22, 2021. Regarding Vasquez's contention that the POs focused only on the retaliation claims against Dew and Johnson, the trial court determined that this issue was meritless. As for the First Amendment retaliation claims, the trial court held that Vasquez "failed to plead facts sufficient to support a finding that any jail staff engaged in retaliatory conduct towards him" and that he "never engaged in any protected conduct or speech." (1925(a) Opinion (Op.) at 3.) Concerning the excessive force claims regarding the spit hood filled with pepper spray, the trial court explained that "[t]here was no evidence of pepper spray sprinkled inside the hood" and that Vasquez "admit[ted] that he was verbally combative with the officers who were conducting the cell search." (*Id.*) The trial court next determined that Vasquez's *Monell*/supervisor liability claim against Berks County failed because Vasquez "ha[d] not pled any facts that demonstrate[d] that Berks County was on notice of any deficiency and

___

we vacated and remanded, determining that there was a factual dispute warranting resolution before the trial court as to his entitlement to *nunc pro tunc* relief. *Vasquez v. Berks Cnty.* (Pa. Cmwlth., No. 1011 C.D. 2020, filed July 30, 2020), slip op. at 16. On remand, the trial court granted the Second Petition, and the present appeal followed.

[17] Vasquez's 1925(b) Statement asserted the trial court erred in dismissing the Amended Complaint because: (1) the POs did not address Vasquez's retaliation claims against the Appellees beyond Dew and Johnson; (2) there were disputed issues of fact surrounding Vasquez's retaliation claims against Dew and Johnson; (3) there were disputed issues of fact surrounding Dew and Johnson's alleged use of excessive force against Vasquez; (4) the POs did not address Vasquez's failure to intervene claims against Appellees Quigley, Smith, Phillips, and Castro; (5) there were disputed issues of fact regarding Vasquez's *Monell*/supervisor liability claims; (6) the POs did not address Vasquez's claim regarding inadequate exercise policies; and (7) the POs did not address Vasquez's due process or tort claims. (O.R. Item 85.)

16

failed to act" and, "absent a constitutional violation[,] the derivative issue of a deficient custom, practice[,] or policy is irrelevant," especially as Vasquez "ha[d] not shown any deficient policies." (*Id.* at 4.)

Next, the trial court found frivolous Vasquez's claim that the POs failed to address his condition of confinement claim concerning inadequate exercise policies rendered any such challenge waived, especially given Vasquez's "history of serious disciplinary infractions" and his placement "in the section of the jail that has heightened safety and security measures." (*Id*. at 5.) Finally, the trial court rejected, as without merit, Vasquez's position that any challenges to the due process or tort claims were waived based on the POs failure to address or object to those claims because the Amended Complaint was procedurally deficient due to its failure to set forth separate counts for Vasquez's claims for relief. Nevertheless, even if the Amended Complaint was procedurally sufficient, the trial court concluded that those additional claims "rel[ied] on the validity of the constitutional claims to have merit," there were no due process violations, and "[t]here cannot be any torts if [no] duty is owed." (*Id.*) For these reasons, the trial court submitted that it properly sustained the POs and dismissed the Amended Complaint.

## II.    DISCUSSION

"[T]he question presented in a demurrer is whether, on the facts averred, the law indicates with certainty that no recovery is possible. In reviewing a [trial] court's decision to grant a demurrer, our Court's standard of review is de novo." *Stilp v. Gen. Assembly*, 974 A.2d 491, 494 (Pa. 2009) (citations omitted). Thus, we will affirm a trial court's order sustaining preliminary objections and dismissal of a complaint "only in cases that are clear and free from doubt that the law will not permit recovery" by the appellant. *Cap. City Lodge No. 12, Fraternal Ord. of Police*

17

*v. City of Harrisburg*, 588 A.2d 584, 586-87 (Pa. Cmwlth. 1991). In ruling on preliminary objections in the nature of a demurrer, this Court accepts as true all well-pleaded facts in the complaint and draws all inferences reasonably deducible therefrom in favor of the nonmoving party. *Stone & Edwards Ins. Agency, Inc. v. Dep't of Ins.*, 616 A.2d 1060, 1063 (Pa. Cmwlth 1992). However, we "need not accept as true conclusions of law, unwarranted inferences from facts, argumentative allegations, or expressions of opinion." *Id.* (citing *Dep't of Pub. Welfare v. Portnoy*, 566 A.2d 336 (Pa. Cmwlth. 1992)). And, in the face of doubt, our resolution should be in favor of reversing the grant of the demurrer. *City of Philadelphia v. Rendell*, 888 A.2d 922, 928 n.17 (Pa. Cmwlth. 2005). With these standards in mind, we turn to the issues Vasquez raises on appeal.

### A. First Amendment Retaliation Claims against Dew and Johnson

#### 1. Parties' Arguments

Vasquez first argues[18] that the trial court erred in sustaining Appellees' demurrer to his First Amendment retaliation claim against Dew and Johnson. Vasquez asserts that the Amended Complaint sufficiently stated a claim under the four-prong test for First Amendment retaliation. (Vasquez's Br. at 24 (citing *Yount v. Pa. Dep't of Corr.*, 966 A.2d 1115 (Pa. 2009)).) Citing *Bush v. Veach*, 1 A.3d 981 (Pa. Cmwlth. 2010), Vasquez submits that the allegations that Dew constantly confiscated and destroyed his legal materials pursuant to an allegedly nonwritten or

---

[18] On appeal, Vasquez does not assert any argument regarding the trial court's dismissal of his First Amendment retaliation claim against Tassone and Matta. An appellant must develop claims with citation to the record and relevant case law, and a failure to do so will result in waiver. *Commonwealth v. Johnson*, 985 A.2d 915, 924 (Pa. 2009). *See* Pennsylvania Rule of Appellate Procedure 2101, 2111, and 2119, Pa.R.A.P. 2101 (explaining that substantial briefing defects may result in dismissal of appeal), 2111, & 2119 (listing requirements for appellate briefs). Accordingly, Vasquez has waived any appeal of the dismissal of that claim.

nonexistent policy and that Johnson imposed arbitrary seven-day mattress restrictions establish sufficient adverse actions to state a claim. (*Id.*) While Vasquez recognizes that Johnson and Dew's conduct "did not deter Vasquez from utilizing the grievance system" he "highlight[s] that had [he] not grieved those incidents or built a documented history[, t]here would be no record showing Dew and Johnson['s] behavioral patterns." (*Id.* at 25.) Further, Vasquez argues that "a ca[u]sal relationship may be appropriately established by evidence of a 'temporal proximity' between the [inmate's] and [] [the d]efendant's adverse action only when the 'timing of the alleged retaliatory action [was] unusually suggestive of retaliatory motive.'" (*Id.* at 27 (quoting *Yount*, 966 A.2d at 1122).)

Vasquez also asserts that, under *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280-81 (3d Cir. 2000),[19] there are other factors relevant to this inquiry, such as "evidence of 'intervening antagonism' between the exercise of the protected speech and the adverse action" and "evidence of 'inconsistent reasons' for the motivation." *Id.* Vasquez argues that these factors are satisfied in the present case because the Amended Complaint: (1) established a timeline of events showing that Dew and Johnson's retaliatory conduct occurred relatively close to his filing of grievances and appeals therefrom; (2) contained allegations of intervening antagonism, such as Dew's statements to Vasquez that he was wasting his time with grievances, and Dew and Johnson's alleged assault with the spit hood filled with pepper spray, including Dew's statement during that alleged incident; and (3) alleged that Dew's unit actions against Vasquez were arbitrary because they were based on items found in every inmate's cell during the search and that Dew's unit action against Vasquez for having

---

[19] While the decisions of federal circuit and district courts are not binding on this Court, they may be cited for their persuasive value. *Kutnyak v. Dep't of Corr.*, 923 A.2d 1248, 1250 (Pa. Cmwlth. 2007).

two mattresses was false. Finally, as for serving a penological interest, Vasquez argues that a prison rule or policy must be "reasonably related to a legitimate penological interest [] and may not represent an exaggerated response to those concerns." (*Id.* at 31 (quoting *Turner v. Safley*, 482 U.S. 78, 96 (1987)) (internal quotations omitted).) Vasquez asserts that "[t]he legal material posed no security threat to the jail," the restriction "was merely a means toward him learning the legal system and participating with his attorney in his pending criminal case," and, given that the one-inch rule for legal material was not in any policy provided to Vasquez, this arbitrary conduct was not reasonably related to serving any penological interest and did not justify treating inmates on Delta Unit different than others. (*Id.* at 32-34.)

Appellees respond that the trial court properly dismissed Vasquez's First Amendment retaliation claim because Vasquez failed to state a claim. (Appellees' Br. at 19.) Appellees argue that Vasquez failed to plead sufficient facts to show that there was any retaliation or adverse action or that there was any causal connection between the alleged retaliation and the protected activity, the use of the grievance system, as Vasquez's "Amended Complaint only includes conclusory allegations that the unit citations he received were in retaliation for his filing grievances." (*Id.* at 21.) Moreover, because the record shows that Vasquez continued to file grievances and appeals from the decisions to those grievances, and Vasquez conceded that the alleged conduct "'did not deter [him] from utilizing the grievance system,'" Appellees argue that Vasquez cannot show that adverse action occurred. (*Id.* at 20-21 (quoting Vasquez's Br. at 25).) Further, Appellees submit that Vasquez failed to demonstrate that the "retaliatory action d[id] not advance legitimate penological goals," as required for First Amendment retaliation claims. (*Id.* at 20

(citing *Yount*, 966 A.2d at 1121) (internal quotations omitted).) Accordingly, Appellees maintain that the trial court properly dismissed Vasquez's First Amendment retaliation claims against Dew and Johnson.

In Vasquez's reply brief, Vasquez responds that, although the retaliatory conduct did not completely deter Vasquez from filing grievances, the retaliatory conduct nonetheless constituted adverse action. Vasquez maintains that he sufficiently pleaded a causal connection by showing that he "repeatedly alerted supervisors that he was being retaliated against for using the grievance system," including by identifying the grievance incidents by number. (Vasquez's Reply Br. at 1-2.)

## 2. Analysis

The Pennsylvania Supreme Court has explained:

> Retaliation claims are guided by the United States Supreme Court's decision in *Turner*[,] 482 U.S. [at] 78[,] which held "courts are ill equipped to deal with the increasingly urgent problems of prison administration . . . ," and great deference must be accorded to the administrative determinations of prison officials.

*Yount*, 966 A.2d at 1119. In *Yount*, our Supreme Court held that to state a First Amendment retaliation claim, a plaintiff must aver sufficient facts to show: (1) the inmate engaged in constitutionally protected conduct; (2) the prison officials' retaliation against that conduct resulted in an adverse action against the inmate; (3) the constitutionally protected conduct was a substantial or motivating factor for the retaliation; and (4) the retaliatory action did not further a legitimate penological goal. *Id.* at 1120; *see also Richardson v. Wetzel*, 74 A.3d 353, 357 (Pa. Cmwlth. 2013). Accordingly, we apply the four prongs of the *Yount* test to Vasquez's allegations in

the Amended Complaint to determine if the trial court erred in sustaining the PO and dismissing these claims.

As for the first prong, in stating a claim for First Amendment retaliation against prison officials under Section 1983, an inmate need not prove that he was denied an independent liberty interest; rather, the inmate must make the threshold showing that he engaged in constitutionally protected conduct that then led to retaliation by prison officials. *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001). It is well settled that the filing of administrative grievances by an inmate concerning actions by prison officials or conditions of confinement invokes the First Amendment right of access to the courts. *Yount*, 966 A.2d at 1121; *Bush*, 1 A.3d at 985. Accordingly, as Vasquez has alleged that his filing grievances against Dew, Johnson, and some of the other Appellees led to the retaliatory conduct of Dew and Johnson, Vasquez has sufficiently pleaded facts to satisfy the first prong of the *Yount* test, and the trial court erred in determining that Vasquez "never engaged in any protected conduct or speech." (1925(a) Op. at 3.)

The second prong requires a showing that the retaliation against constitutionally protected conduct resulted in adverse action. For purposes of a retaliation claim, an adverse action is "one which is 'sufficient to deter a person of ordinary firmness from exercising his [constitutional rights.]'" *Yount*, 966 A.2d at 1121 (quoting *Allah v. Seiverling*, 229 F.3d 220, 225 (3d Cir. 2000)) (alteration in original). "Where a plaintiff advances a colorable, but not necessarily incontrovertible, argument he was subjected to adverse action, the issue is best resolved by the fact-finder." *Id.* In *Yount*, an inmate averred retaliation in the form of a prison transfer after he brought a lawsuit against the Pennsylvania Department of Correction's (DOC) telecommunication provider for overcharging inmates, which

the inmate alleged had "interfered with and denied his right of access to the courts." *Id.* at 1117. In considering whether such an alleged transfer rose to an adverse action for the purpose of First Amendment retaliation, our Supreme Court held: "Although it is possible that in some cases [a transfer] would not deter a prisoner of ordinary firmness from exercising his or her [constitutional right to access the courts], we cannot say that such action can never amount to adverse action.'" *Id.* at 1121 (quoting *Seiverling*, 229 F.3d at 225) (internal quotations omitted; alterations in original).

Focusing first on Vasquez's retaliation claim against Dew for confiscating and destroying his legal materials, Appellees argue that the record demonstrates that Vasquez was not deterred from filing grievances and, moreover, that Vasquez conceded the same. Vasquez acknowledges that Dew and Johnson's conduct "did not deter [him] from utilizing the grievance system." (Vasquez's Br. at 25.) While Vasquez conceded he has not been deterred, dismissing an inmate's claims of unconstitutional retaliation on that concession alone would be inconsistent with *Yount*, which requires only that the adverse action be "sufficient to deter **a person of ordinary firmness** from exercising his [constitutional rights.]" 966 A.2d at 1121 (emphasis added; internal marks omitted). Under this objective standard, "[t]he relevant question is whether the defendant['s] actions are **capable of deterring** a person of ordinary firmness; there is **no requirement that the plaintiff show actual deterrence**." *Bell v. Johnson*, 308 F.3d 594, 606 (6th Cir. 2002) (citations and quotations omitted; emphasis added). Accordingly, that Vasquez himself was not

actually deterred does not mean that he has not sufficiently pleaded that there was adverse action.[20]

Appellees maintain that Vasquez cannot establish adverse action because he "was limited to one inch of legal materials in his cell and was able to exchange these materials for additional legal paperwork kept in his separately stored kickbox." (Appellees' Br. at 41 (citing Orig. Compl. Ex. 17; Am. Compl. Ex. B).) Thus, any "adverse" action was the result, Appellees argue, of the violation of this policy and not because of Vasquez's engagement in constitutionally protected activity. However, the cited exhibits simply contain Smith's responses to Vasquez's grievances, explaining that Vasquez was limited to one inch of legal material and could ask to exchange materials as needed. (*See id.*) Smith pointed to no policy in those responses that authorize this restriction. (*See* Orig. Compl. Ex. 17; Am. Compl. Ex. B.) Vasquez avers there is no such policy and, if there is, it is not a written one provided to the inmates, citing Exhibits 1 (Inmate Handbook) and 17 (an ICC Report) of the Original Complaint, which do not include or point to any such

---

[20] While this Court has held, in two unreported opinions, that an inmate did not establish an adverse action under *Yount* based on the confiscation and destruction of legal materials because **the inmate** continued to file lawsuits and grievances and the challenged conduct was authorized by DOC's policy, those cases are distinguishable. *See Jordan v. Overmyer* (Pa. Cmwlth., No. 1863 C.D. 2017, filed June 29, 2018) (*Jordan II*), slip op. at 6-8; *Jordan v. Pa Dep't of Corr.* (Pa. Cmwlth., No. 416 M.D. 2016, filed July 21, 2017) (*Jordan I*), slip op. at 5-6. In *Jordan I* and *Jordan II*, an inmate alleged that prison officials had unconstitutionally confiscated **boxes** of his legal material in retaliation for filing numerous civil lawsuits and grievances. Recognizing that the inmate had invoked the constitutional right of access to the courts, this Court nevertheless determined that the inmate failed to meet the second prong of the *Yount* test because the inmate was especially litigious, including filing **numerous civil** actions, and because the officials had confiscated the legal materials pursuant to DOC's **established** policies, which gave facility managers the discretion to allow, or not, inmates to have extra boxes of legal materials in their cell. *Jordan I*, slip op. at 5; *Jordan II*, slip op. at 6 n.4. Here, in contrast, the "litigation" in which Vasquez concedes he is continuing are grievances **related to the ongoing retaliation**, and the **one-inch** rule used as justification is alleged to be either **nonexistent or unwritten**.

policy. (*See* Orig. Compl. Exs. 1, 17.) Accepting as true Vasquez's averment that there was no established policy restricting inmates in Delta Unit to one inch of legal material, *Stone & Edwards*, 616 A.2d at 1063, the alleged rule violation cannot be a basis for the dismissal of Vasquez's retaliation claim based on a lack of adverse action.

This is consistent with decisions of numerous federal courts, which have found adverse action based on the retaliatory seizure of legal documents. *See Bell*, 308 F.3d at 604 (collecting cases). The United States Circuit Court of Appeals for the Sixth Circuit (Sixth Circuit), has determined that

> [t]he fact that [the] defendants repeatedly stole plaintiff's legal papers certainly had the potential to directly impede his pursuit of his claim, and may have caused others to believe that any efforts they may expend in preparing legal claims would be wasted since any materials they prepared could be easily destroyed or confiscated.

*Id.* at 605. The Sixth Circuit found "no basis for concluding that inmates should be required to tolerate the theft of their property, including legal documents . . . , as the price of petitioning the courts." *Id.*

Here, Vasquez alleged that "Dew had a history of retaliating and harassing [him] for utilizing the grievance system against Dew," who "would regularly confiscate and destroy Vasquez's legal materials," and attached grievances, appeals, and affidavits as a means of corroborating that averment. (Am. Compl. ¶¶ 13-14, Ex. 3.) Like the inmate in *Bell*, Vasquez consistently alleged throughout the Amended Complaint that Dew "repeatedly stole [his] legal papers." 308 F.3d at 604. Similar to the Sixth Circuit, we discern "no basis for concluding that [Vasquez] should be required to tolerate the theft of [his] property . . . , as the price of petitioning the courts" and filing grievances for the same conduct, especially given that Vasquez

25

here alleges that same repeated conduct from Dew. *Id.* Accordingly, accepting as true the allegations that Dew repeatedly confiscated and destroyed Vasquez's legal materials in response to Vasquez filing grievances, *Stone & Edwards*, 616 A.2d at 1063, and there was no established prison policy limiting legal materials to one inch, Vasquez has "advance[d] a colorable, but not necessarily incontrovertible, argument he was subjected to adverse action." *Yount*, 966 A.2d at 1121. Therefore, Vasquez has sufficiently alleged a prima facie showing of an adverse action as to his retaliation claim against Dew.

Turning to the third prong of the *Yount* test, an appellant must demonstrate a causal relationship between the constitutionally protected conduct and the alleged adverse action, showing that the conduct was a substantial or motivating factor for the retaliation. This showing may be accomplished by establishing evidence of a **temporal proximity** between the protected activity and the adverse action such that the "timing of the alleged retaliatory action [is] unusually suggestive of retaliatory motive." *Yount*, 966 A.2d at 1122 (alteration in original; quotation omitted). In *Yount*, our Supreme Court determined that an eight-month delay between the inmate's protected activity, which was commencement of litigation, and the adverse action, which was his transfer to a different prison, did not show a sufficient causal relationship. *Id.* at 1121. In *Farrell*, upon which Vasquez relies, the United States Court of Appeals for the Third Circuit (Third Circuit) explained that, "[a]lthough timing and **ongoing antagonism** have often been the basis for the causal link, our case law clearly has allowed a plaintiff to substantiate a causal connection for purposes of the prima facie case through **other types of circumstantial evidence that support the inference**." 206 F.3d at 280-81 (emphasis added). The Third

26

Circuit held that the other types of circumstantial evidence that support such an inference includes **intervening antagonism**. *Id.* at 281.

While *Farrell* focused on retaliation in the employment setting, Justice Todd recognized in her concurring Opinion in *Yount*, which was joined by then-Chief Justice Castille and now-Chief Justice Baer, that the law on employment retaliation has been applied in the inmate setting by numerous federal circuit courts. *Yount*, 966 A.2d at 1124 (Todd, J., concurring). Justice Todd noted that "[w]here temporal proximity alone does not support an inference of causation, courts considering employment cases have traditionally looked to whether the period between the protected conduct and the adverse action was marked by ongoing antagonism." *Id.* at 1128 n.7 (citing *Farrell*, 206 F.3d at 279). Additionally, in *Watson v. Rozum*, 834 F.3d 417, 424 (3d Cir. 2016), the Third Circuit applied the *Farrell* approach for causal relationship to a retaliation claim by an inmate. The Third Circuit clarified that "[w]here the temporal proximity is not so close as to be unduly suggestive, the appropriate test is timing plus other evidence." *Id.* (internal quotations omitted). There, the inmate alleged to have been issued a false misconduct after requesting a grievance form, where there was a six-hour gap between the two incidents. However, the Third Circuit also considered the inmate's allegation that the officer who issued the misconduct was writing the inmate up for giving him a "hard time" and not being "polite." *Id.* Focusing on the officer's statements to the inmate rather than the temporal proximity, the court held that the inmate had "established a prima facie case against [the officer], because there is a genuine issue of material fact as to whether [the inmate's] decision to file a grievance motivated [the officer] to charge him with misconduct." *Id.* Accordingly, under this approach, ongoing and

intervening antagonism may establish causal connection where temporal proximity alone is insufficient.

Given the nature of pro se inmate litigation and the difficulty of establishing a close temporal proximity in the case-specific circumstances where the inmate alleges repeated conduct in retaliation to grievances and appeals over a long period of their incarceration, the Third Circuit's approach is persuasive. Applying that approach to these facts, Vasquez has sufficiently averred facts, which we accept as true at this stage, that could establish a causal relationship between his filing of grievances and Dew's confiscation and destruction of his legal materials. First, looking to the temporal proximity between Vasquez's initial July 9, 2014 grievance against Dew for confiscating and destroying his legal materials and the repeated conduct on January 8, 2015, there is an approximate six-month gap between the initial grievances and that adverse action. While this temporal proximity is not by itself indicative of a causal relationship under our precedent, *Yount*, 966 A.2d at 1121, Vasquez also alleged that, after he filed a grievance on January 9, 2015, concerning that conduct, Dew came by his cell and stated, "'[y]ou're wasting your time with those grievances, this isn't Philadelphia[.] [W]e do things a little different in Berks County.'" (Am. Compl. ¶ 15.) Vasquez further alleged that on January 27, 2015, Dew returned and issued him a baseless unit action and placed him on a seven-day mattress restriction. Vasquez also points to the incidents in June and July 2015, where Dew confiscated legal materials after the culmination of Vasquez's appeal of the denied grievance against Fisher and Remp and after he had requested the correct meal, respectively.

While the temporal proximity presented by this timeline, alone, may be insufficient to establish that the "timing of the alleged retaliatory action [wa]s

28

unusually suggestive of retaliatory motive," *Yount*, 966 A.2d 1122, the allegations of Dew's ongoing and intervening antagonism during the time period sufficiently suggests a causal relationship. Dew's alleged statement to Vasquez that Vasquez was "wasting his time with those grievances" is the clearest indication of Dew's motivation for his conduct, (Am. Compl. ¶ 15), especially given that Vasquez alleged that Dew would continuously confiscate and destroy Vasquez's legal materials shortly after he filed a grievance or when the appeal process from a previous grievance had terminated. Similar to how the officer's statements in *Watson*, 834 F.3d at 424, that the inmate had been giving the officer a "hard time" and was not being "polite" raised a question of fact as to whether the officer's motivation in issuing the misconduct stemmed from the inmate's use of the grievance system, Dew's alleged statement to Vasquez and Vasquez's allegations that Dew's conduct repeatedly followed grievances are sufficient to establish a prima facie showing that Vasquez's filing of grievances "was a substantial or motivating factor for the" retaliation, *Yount*, 966 A.2d at 1120.

Finally, the fourth prong of the *Yount* test requires the appellant to affirmatively disprove a legitimate penological goal. This final prong is designed to prevent any "'potential for abuse' inherent in retaliation claims and also [to promote the] policy of judicial deference to the prison officials' 'legitimate interest in effective management of a detention facility.'" *Richardson v. Wetzel*, 74 A.3d 353, 357 (Pa. Cmwlth. 2013) (quoting *Yount*, 966 A.2d at 1120-21). "'Claims of retaliation fail if the alleged retaliatory conduct violations were issued for the actual violation of a prison rule.'" *Horan v. Newingham* (Pa. Cmwlth., No. 2622 C.D. 2015, filed Oct. 24, 2016), slip op. at 9 (quoting *Hartsfield v. Nichols*, 511 F.3d 826, 829

(8th Cir. 2008)).[21] "'Thus, a defendant may successfully defend a retaliatory discipline claim by showing some evidence the inmate actually committed a rule violation.'" *Id.*

In *Hackett v. Horn*, 751 A.2d 272, 275 (Pa. Cmwlth. 2000), this Court considered a similar issue when determining whether a DOC rule limiting the amount of legal materials that may be kept in a cell to 1 box and 10 law books was challenged on due process grounds. Considering whether the rule was reasonably related to legitimate penological interests, such as safety or security, the Court found that the limitations on legal materials authorized by an official policy were reasonably related to those penological goals because "[i]f the inmates were allowed to keep as much material as desired, an obvious fire hazard would be created. This is especially true where inmates are locked in their cells." *Id.* "Moreover, an excessive amount of material in the cell provides an opportunity to hide contraband." *Id.* Thus, some restrictions on the legal material that inmates may keep in their cells authorized by established prison rules and policies further the penological goals of safety and security.

Here, Appellees argue that Vasquez failed to plead that the conduct did not serve a penological goal and that his Brief did not sufficiently expand on the argument. As to the Amended Complaint, we disagree that Vasquez failed to plead or to address the issue in his Brief sufficiently. Vasquez pleaded that the one-inch rule was not an actual policy but an "unwritten," "silent policy" not provided in any of the handbooks or rules provided to him, which served "no legitimate penological interest," "was excessive in light of managing and maintaining order and security,"

---

[21] Pursuant to Pennsylvania Rule of Appellate Procedure 126(b), Pa.R.A.P. 126(b), and Section 414(a) of this Court's Internal Operating Procedures, 210 Pa. Code § 69.414(a), an unreported opinion of this Court, while not binding, may be cited as persuasive.

and was "designed as a form of punishment and a way to withhold Vasquez from reasonably accessing the courts to litigate his cases." (Am. Compl. ¶¶ 9, 35.) Further, in his Brief, Vasquez argues that "[t]he legal material posed no security threat to the jail," "was merely a means toward him learning the legal system and participating with his attorney in his pending criminal case," and, given that the one-inch rule for legal material was not in any policy provided to Vasquez, the confiscation of "excess" legal material was arbitrary conduct not reasonably related to serving any penological interest and did not justify treating inmates on Delta Unit different than others. (Vasquez's Br. at 32-34.) Thus, while not especially developed, Vasquez's allegations did not completely fail to address this prong of the *Yount* test.

Accepting his averments as true, Vasquez has sufficiently pleaded that the one-inch rule here was not pursuant to any policy and that there is no reasonable penological goal served by restricting legal materials in inmates' cells to one inch. Unlike *Hackett* and *Horan*, Appellees have pointed to no official rule or policy in the record that authorized Dew to confiscate Vasquez's legal materials for being over one inch. Moreover, unlike the entire box of legal material that was permitted to inmates pursuant to the policy in *Hackett*, the restriction here allows inmates one inch of legal material. While limiting inmates to a single **box** of legal materials may serve the penological interest of safety where multiple boxes could create a safety issue in the event of a fire or other emergency or as a means of hiding contraband, it is not as clear that limiting inmates to a single **inch** of legal materials accomplishes the same. In the face of doubt, at this stage, we must resolve this question in favor of reversing the grant of demurrer. *City of Philadelphia*, 888 A.2d at 922 n.17.

31

Accordingly, Vasquez has sufficiently pleaded facts that satisfy the fourth prong of the *Yount* test as to Dew.

However, applying the *Yount* prongs to Vasquez's allegations against Johnson, we agree with the trial court that Vasquez did not state a claim for retaliation. Unlike the confiscation and destruction of legal materials, it is not as clear whether a temporary removal of a mattress constitutes adverse action. *Compare Anderson v. Warden of Berks Cnty. Prison*, 602 F. App'x 892, 894-95 (3d Cir. 2015) (reinstating a retaliation claim that involved the removal of a mattress), *with Branch v. Bauman*, No. 2:12-CV-16, 2014 WL 413512 (W.D. Mich. Feb. 4, 2014) (temporary removal of mattress was not an adverse action because it would not deter a person of ordinary firmness). As it is not clear that such a claim could or could not constitute an adverse action, the lack of adverse action may not support the sustaining of the demurrer on this basis. However, reviewing the allegations against the remaining prongs of the *Yount* test, Vasquez failed to allege sufficient facts to show a causal connection between this alleged adverse action and his filing of grievances so as to sufficiently plead that his filing of grievances motivated Johnson's conduct. Absent from those allegations are claims of temporal proximity or ongoing and intervening antagonism associated with Vasquez's engaging in a constitutionally protected right and Johnson's actions. Finally, Vasquez did not allege that the mattress restriction, which is a restriction set forth in the Inmate Handbook, (Orig. Compl. Ex. 1 at 2-3), for inmates in Disciplinary Segregation on Delta Unit, did not further any penological goal. Thus, Vasquez has not sufficiently pleaded facts that would support a finding that two of the *Yount* prongs were met against Johnson.

32

For the foregoing reasons, because Vasquez sufficiently stated a prima facie case under *Yount* for a First Amendment retaliation claim against Dew for the repeated confiscation and destruction of Vasquez's legal materials, the trial court erred in sustaining the PO and dismissing that claim. However, because Vasquez failed to do the same for Johnson based on the issuance of the mattress restrictions, the trial court did not err in dismissing this claim.

### B. *Excessive Force Claim against Johnson and Failure to Intervene Claim against Dew*

#### 1. Parties' Arguments

Vasquez next argues[22] that the trial court erred in dismissing his claim that Johnson's conduct constituted excessive force in violation of the Eighth Amendment's prohibition against cruel and unusual punishment and that Dew failed to protect him. Vasquez asserts that "[t]he core judicial inquiry is not whether a certain quantum of injury was sustained, but rather whether[] force was applied in [a] good faith effort to maintain or restore discipline, or malicious and sadistic to cause harm." (Vasquez's Br. at 35 (citing *Wilkins v. Gaddy*, 559 U.S. 34 (2010)).) Vasquez maintains that Johnson's conduct in "unprovokingly [sic] plac[ing] a spit[ ]hood over Vasquez['s] head filled with pepper[ ]spray," ordering him to his knees, and forcing him to "remain[] in that position suffocating for several minutes" constituted excessive force. (*Id.* at 36.) Vasquez argues that the trial court's denial of this claim on the basis that "there was no evidence that pepper[]spray was sprinkled inside the spit[ ]hood" was contrary to the allegations, as "seven witnesses issued statements that Vasquez was coughing and repeated that his eyes were

---

[22] Vasquez does not assert any argument in his appeal regarding the trial court's dismissal of his Eighth Amendment excessive force claim against Fisher and Remp. As such, Vasquez has waived any appeal of the dismissal of that claim. *Johnson*, 985 A.2d at 924; Pa.R.A.P. 2101, 2111, & 2119.

burning." (*Id.* (citing Orig. Compl. Ex. 27).) Vasquez contends that whether the spit hood contained pepper spray constitutes a disputed fact that should have been decided by a jury. As for Dew's failure to intervene with regard to Johnson's use of excessive force through the spit hood containing pepper spray, Vasquez argues that officers are liable under Section 1983 for failing to intervene when an unconstitutional use of force occurs in their presence and the officers had a realistic and reasonable opportunity to intervene. (*Id.* at 37 (citing *Byrd v. Clark*, 783 F.2d 1002, 1007 (11th Cir. 1986); *Smith v. Mensinger*, 293 F.3d 641, 651 (3d Cir. 2002)).) Vasquez maintains that Dew "had every opportunity to intervene [into] Johnson[']s use of excessive force[,] but he did not." (*Id.*)

Appellees respond that, in order to state a claim for excessive force, it must be shown that: (1) the force was not "applied in a good faith effort to maintain or restore discipline [but] maliciously and sadistically to cause harm," *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986); and (2) "the prison official's conduct was sufficiently serious to violate 'contemporary standards of decency,'" *Hudson v. McMillian*, 503 U.S. 1, 8 (1992). (Appellees' Br. at 24-25.) Appellees maintain that the trial court did not err in dismissing this claim because "the use of the spit hood by [Johnson] was a good faith effort to maintain discipline and does not shock the conscience." (*Id.* at 26.) Moreover, Appellees assert that "[t]he Exhibits referenced in the Amended Complaint demonstrate that no such excessive force was levied against" Vasquez. Instead, these Exhibits allegedly show that Vasquez was "verbally abusive towards" Dew and Johnson, which justified the use of the spit hood, even though this conduct was not necessarily combative, because it could have escalated to a threatening situation. (*Id.* at 26-27 (citing Orig. Compl. Exs. 28, 29).)

In his reply brief, Vasquez asserts that "Appellees are attempting to minimize Dew and Johnson's actions," that Johnson's response to a comment Vasquez made to another inmate was an exaggerated response, and that Vasquez "did not display any exigent or aggressive behavior toward Johnson [or] Dew[] [that] would justify a use of force." (Vasquez's Reply Br. at 3.) Further, Vasquez contends that Dew's statement to not "cry now" shows Dew's culpable state of mind. (*Id.* at 4.) Vasquez argues that Appellees ask this Court to solely focus on the response from supervisors who responded to Vasquez's grievance as to this issue while ignoring the numerous witness statements describing the incident. Vasquez maintains that there "are disputable facts that should be left for a jury to decide." (*Id.* at 4.)

2. Analysis

a. Excessive Force Claim against Johnson

The Eighth Amendment to the United States Constitution protects against the infliction of "cruel and unusual punishments." U.S. CONST. amend. VIII. The United States Supreme Court has interpreted the Eighth Amendment to protect inmates against "the unnecessary and wonton infliction of pain." *Whitley*, 475 U.S. at 320. However, "[n]ot every governmental action affecting the interests or well-being of a[n] [inmate] is subject to Eighth Amendment scrutiny." *Id.* at 319. Nonetheless, prison guards who maliciously and sadistically use force against an inmate violate contemporary standards of decency even if the resulting injuries are not significant. *Hudson*, 503 U.S. at 9.

Two requirements must be met to establish that a prison official has violated the Eighth Amendment by inflicting excessive force against an inmate. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). First, the objective component requires that the "deprivation alleged [] be, objectively, sufficiently serious" to constitute a denial of

35

the "minimal civilized measure of life's necessities." *Id.* (internal quotations omitted). The Supreme Court has made clear that an injury is sufficiently serious for purposes of the objective component as long as it rises above the level of *de minimis* harm. *See Hudson*, 503 U.S. at 9-10 (rejecting that minor injuries are not actionable under the Eighth Amendment). Second, there is a subjective component, as "only the unnecessary and wanton infliction of pain implicates the Eighth Amendment"; it must be shown that a prison official acted with a "sufficiently culpable state of mind." *Farmer*, 511 U.S. at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 303 (1991)). Excessive force claims under the Eighth Amendment require a heightened mental state, that the prison official applied force "maliciously and sadistically for the very purpose of causing harm." *Id.* at 835.

"[I]t is well[ ]established that the use of chemical agents[, such as pepper spray,] on recalcitrant prisoners is not per se unconstitutional." *Thomas v. Bryant*, 614 F.3d 1288, 1310 (11th Cir. 2010). However, federal circuit courts have held "that where chemical agents are used unnecessarily, without penological justification, or for the very purpose of punishment or harm, that use satisfies the Eighth Amendment's objective harm requirement." *Id.*

For instance, in *Iko v. Shreve*, 535 F.3d 225, 239-40 (4th Cir. 2008), the United States Court of Appeals for the Fourth Circuit (Fourth Circuit) held that an inmate had sufficiently stated a claim that a prison official used excessive force in violation of the Eighth Amendment by applying pepper spray while removing an inmate from his cell because the official continued to spray even after the inmate attempted to comply and then did not change the inmate's clothing, remove the spit mask, or secure any medical treatment. The Fourth Circuit "easily conclude[d]" that the objective component of the excessive force claim was established by such an

36

application of pepper spray to a **compliant** inmate. *Id.* at 239. The *Iko* Court then applied the following "four non-exclusive factors to assist courts in assessing whether an officer has acted with 'wantonness'":

> (1) "the need for the application of force"; (2) "the relationship between the need and the amount of force that was used"; (3) the extent of any reasonably perceived threat that the application of force was intended to quell; and (4) "any efforts made to temper the severity of a forceful response."

*Id.* (quoting *Whitley*, 475 U.S. at 321).

Looking to the first factor, the *Iko* court held that there was "no question that some dispersal of pepper spray was [initially] warranted in carrying out the cell extraction" where the inmate was noncompliant with directives to exit the cell. *Id.* As for the second factor, however, the court determined that there was a question as to whether the inmate was complying with the official's orders when the official chose to continue applying bursts of pepper spray. In applying the third factor, the court held that the fact that the inmate was complying when the official **continued** to use pepper spray was also relevant, as after the inmate began complying, the need for force was no longer reasonable to any perceived threat to the official. *Id.* at 239-40. Finally, considering the fourth factor, the court held that the fact that the official did not change the inmate's clothing, remove the spit mask, or secure any medical treatment showed that there were not sufficient efforts to temper the forceful conduct. *Id.* at 240. Accordingly, the court determined that three of the four factors supported a determination that the subjective component of the excessive force claim was satisfied. *Id.*

In *Thompson v. Virginia*, 878 F.3d 89, 100 (4th Cir. 2017), the Fourth Circuit applied the factors where the inmate allegedly complied from the beginning of the

37

interaction. In that case, the facts alleged showed that the defendant prison officials never had any need to use force against an inmate because the inmate had complied with all instructions leading up to the use of force. Under those circumstances, the Fourth Circuit held that there was no basis for the use of force and that the first factor was met. *Id.* at 99-100. The court determined that the second factor weighed in the inmate's favor "because there was no need to use force [due to the inmate's compliance], the force used was necessarily excessive in relation to the need." *Id.* at 100. The court likewise concluded that the third factor favored the inmate because the officials had not asserted that the inmate was a threat to anyone, and the facts presented showed that he posed no threat given that he was restrained. *Id.* The court held the fourth factor was a draw, as the officials obtained medical assistance for the inmate after the incident. *Id.* Balancing the factors, the court concluded that the inmate had sufficiently alleged an Eighth Amendment excessive force claim. *Id.* at 101-02.

We now apply these factors to the facts alleged in the present case. Looking first to the objective component, Vasquez alleged that Dew and Johnson came to his cell, directed him to cuff up, **Vasquez complied**, and his hands were **cuffed behind his back**, and he exited the cell. (Am. Compl. ¶ 37.) After a fellow inmate inquired what was going on, Vasquez responded to the other inmate that "these guys are on their b.s. again." (*Id.*) Notwithstanding that Vasquez **had complied**, Vasquez alleged that Johnson replied, "you know what[,] I'm tired of your shit," and then placed a bag filled with pepper spray over Vasquez's head. (*Id.*) Vasquez further alleged that Johnson then ordered him to get on his knees, his eyes began burning, he was gasping for air, and he was left in that position for several minutes having trouble breathing. (*Id.*) The trial court dismissed this claim on the basis that there

was no evidence that there was pepper spray inside the spit hood; however, this disregarded Vasquez's well-pleaded averments, which must be accepted as true. *Stone & Edwards*, 616 A.2d at 1063. Further, while Appellees assert that the use of the spit hood does not rise to a sufficiently serious deprivation and that its use was justified, neither the POs nor Appellees' Brief refer to the spit hood as having been filled with pepper spray. Unlike the trial court and Appellees, and similar to the Fourth Circuit in *Iko*, 535 F.3d at 239, we "easily conclude" that the facts Vasquez averred could support a finding that the use of the spit hood filled with pepper spray after he complied rises above the *de minimis* injury and is a sufficiently serious deprivation to satisfy the objective component of the inquiry, *Farmer*, 511 U.S. at 834.

Turning to the subjective component, we apply the *Whitley* factors to Vasquez's allegations. First, the facts as alleged, and accepted as true at this stage of the proceedings, raise the question of whether there was **any** need for the application of force. Accepted for their truth, the facts alleged reflect that Vasquez **complied** with the direction that he cuff up and exit his cell, and it was only **after** Vasquez responded to a comment from a fellow inmate that Johnson utilized the spit hood filled with pepper spray and forced Vasquez to his knees. (Am. Compl. ¶ 37.) Appellees contend that the comment Vasquez made to the fellow inmate, "these guys are on their b.s. again," was verbally abusive toward Dew and Johnson and **could have** escalated to assaultive or combative behavior thereby rendering the precautionary use of the spit hood appropriate. (Appellees' Br. at 26 & n.8, 27.) They further maintain that the use of the spit hood was a good faith effort to maintain discipline. Unlike in *Iko*, where the inmate initially refused to follow the directives from the prison officials thereby justifying the initial use of pepper spray, Vasquez

39

allegedly complied with the directive and **then** made a comment to another inmate. Such compliance is like the actions of the inmate in *Thompson*, in which the Fourth Circuit held that **no** force was needed. While Appellees argue that the force used was justified because Vasquez was "verbally abusive towards" Dew and Johnson and, potentially, Vasquez's behavior could have escalated to become assaultive or combative, (Appellees' Br. at 26-27 (quoting Orig. Compl. Ex. 28)), accepting Vasquez's allegations as true, there are questions as to how a statement made to a fellow inmate constituted verbal abuse directed at Dew and Johnson, so as to require discipline, and how this statement, made while Vasquez's hands were cuffed behind his back, could have led to combative or assaultive behavior by Vasquez that would justify the force used. Such questions of fact are for the jury. Thus, accepting Vasquez's allegations as true, we disagree that it is clear and free from doubt that Vasquez's statement, made while he was otherwise compliant and his hands were cuffed, justified the need for the force used in this instance.

Second, Vasquez alleged that he complied with the directive to cuff up and, in response to Appellees' arguments that he was verbally abusive and this could have led to assaultive behavior, denied that he engaged in any exigent or aggressive conduct that would justify the need for the use of force. Vasquez's alleged compliance with the directive, like that of the inmate in *Thompson*, may establish that "there was no need to use force, [and that] the force used was necessarily excessive in relation to the need" as to that behavior. 828 F.3d at 100. Even the *Iko* court determined that the use of force became disproportionate once the inmate began making an effort to comply. To the extent Appellees focus on the statement made to the other inmate as requiring discipline and the potential that Vasquez's behavior could escalate to become combative as justifying the level of force used,

40

we believe these are questions of fact to be resolved by the jury. Accordingly, accepting the facts alleged as true, we disagree that it is clear and free from doubt that level of force used was proportionate to the need to combat Vasquez's behavior.

Third, similar to the officials in *Thompson*, Appellees do not argue that Vasquez posed a threat to anyone, but assert that the situation **could have escalated** to become threatening. (Appellees' Br. at 26-27.) However, accepting the allegations as true, it is unclear what "reasonably perceived threat," *Iko*, 535 F.3d at 239, to Dew and Johnson the use of force was intended to quell because Vasquez had complied, his hands were cuffed behind his back, and no threats had been made. Thus, Vasquez has adequately pleaded that there was no reasonably perceived threat that would justify the application of force.

Finally, the fourth factor, concerning efforts used to temper the use of force, leans in favor of concluding that Vasquez sufficiently stated a constitutional violation. Here, Vasquez alleged that after the spit hood was placed over his head, he was ordered on to his knees, his eyes began burning while he struggled to breathe, he "remained in that position for several minutes gasping for air," that the bag was **only** taken off of his head because a sergeant came to the scene and directed its removal, and that no medical attention was provided to him. (Am. Compl. ¶ 37.) Similar to *Iko*, the allegations that Johnson forced Vasquez to remain on his knees while he was having trouble breathing for several minutes, that Johnson did not attempt to provide Vasquez with any medical attention once the spit hood was ordered to be removed, and that Vasquez had to wash it out of his eyes on his own, when accepted as true, are sufficient to establish that there was insufficient effort to temper the severity of the force.

In sum, accepting the facts alleged as true, Vasquez has sufficiently pleaded facts from which a factfinder could infer that Johnson wantonly inflicted pain upon Vasquez by employing an excessive use of force by placing a spit hood filled with pepper spray over Vasquez's head for several minutes where Vasquez complied with the directive to cuff up and it is not clear and free from doubt that Vasquez's statement to the other inmate justified the force used, and by not providing medical assistance afterward. Accordingly, because Vasquez has sufficiently alleged facts that could establish the objective and subjective components for stating a prima facie claim for excessive force against Johnson, the trial court erred in granting Appellees' demurrer and dismissing this claim.

b. Dew's Failure to Intervene

We turn now to Vasquez's failure to intervene claim against Dew for this same incident involving Johnson's use of excessive force. "If a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is directly liable under Section 1983." *Byrd*, 783 F.2d at 1007. With regard to prison officials, in *Smith*, 293 F.3d at 650-52, the Third Circuit extended this rule to prison officials. The *Smith* court held "that a corrections officer's failure to intervene in a beating can be the basis of liability for an Eighth Amendment violation under [Section] 1983 if the corrections officer had a reasonable opportunity to intervene and simply refused to do so." *Id.* at 650.

Here, Vasquez argues that he sufficiently pleaded facts showing that Dew "had every opportunity to intervene [into] Johnson[']s use of excessive force[,] but he did not." (Vasquez's Br. at 37.) We agree. Having already determined that Vasquez has sufficiently stated a claim against Johnson for the unconstitutional use

42

of excessive force, the well-pleaded facts against Dew likewise state a claim for failure to intervene. Vasquez alleged that Dew was present during the incident, initially ordered Vasquez to cuff up for the cell inspection, and when Vasquez "asked Johnson why he was being treated like that if he was not combative, Dew . . . stated[,] 'Don't cry now[,] you wanna play games we know how to play games too.'" (Am. Compl. ¶ 37.) Nothing in the allegations or record suggests any reason that Dew lacked the opportunity to stop Johnson from using the spit hood filled with pepper spray, to intervene and require the removal of the spit hood, or to provide medical assistance to Vasquez. From these allegations, which are accepted as true, *Stone & Edwards*, 616 A.2d at 1063, a factfinder could conclude that Dew "simply refused to do so," *Smith*, 293 F.3d at 650. Therefore, the trial court erred in granting Appellees' demurrer to Vasquez's failure to intervene claim against Dew.

### C. Monell Liability Claims against Berks County and Quigley

#### 1. Parties' Arguments

Vasquez argues that, under *Monell*, Appellee Berks County is liable under Section 1983 for constitutional deprivations resulting from a governmental "custom" even though such custom has not been officially authorized or formally approved through the body's decision-making procedures. In this matter, Vasquez asserts that Berks County adopted the following policies or customs that deprived him of his rights: (1) inadequate exercise opportunities; (2) restriction of legal materials; and (3) arbitrary unit actions in the form of seven-day mattress restrictions.

First, Vasquez argues that he was forced to exercise in the cold with inadequate clothing and was shackled during the indoor exercise time, thus depriving him of adequate exercise opportunities claiming "that it was policy." (Vasquez's

Br. at 39-40 (citing Orig. Compl., Ex.8; Am. Compl., Ex. H).) When Vasquez raised this issue to the ICC, he asserts he was informed that the exercise policies were approved by Quigley or otherwise pursuant to county and state policies. Second, Vasquez maintains that he had a due process interest in his legal materials, that he was not provided notice or an opportunity to be heard regarding the restrictions on his legal materials, and that there was no official or actual policy authorizing the restrictions. When Vasquez raised the policy before the ICC, he was again informed that there was a one-inch rule for inmates in the Delta Unit. (*Id.* at 44-45 (citing Orig. Compl., Ex. 17).) Finally, Vasquez likewise asserts that the mattress restrictions violated due process because he was not on notice that any misconduct would result in a mattress restriction without the ability to be heard. While Vasquez concedes that mattress restrictions were a listed sanction in the Inmate Handbook, as he was told when he brought the issue before the ICC, Vasquez maintains that the handbook does not indicate that S.O.G. members could issue a unit action, including a mattress restriction. As such, Vasquez argues that this custom of allowing S.O.G. members to impose mattress restrictions was approved by Quigley. Moreover, Vasquez asserts that Quigley had a statutory obligation to promulgate rules and regulations, and, accordingly, that authority is sufficient to establish liability against Berks County under *Monell*. Therefore, Vasquez maintains that Berks County is liable under Section 1983 for the alleged constitutional deprivations.

Appellees respond that the trial court properly dismissed Vasquez's *Monell*/supervisory liability claims. Appellees maintain that Vasquez's claim was properly dismissed because Vasquez failed to "demonstrate that a deficient municipal policy or practice resulted in a constitutional violation," as required under *Monell*. (Appellees' Br. at 30.) While recognizing that a custom that is not officially

44

authorized or adopted may serve as the basis for such a claim, Appellees argue that Vasquez failed to show that there existed a pattern of similar violations such that Berks County was on notice of the issue but failed to act, given "a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*." (*Id.* at 31 (quoting *Groman v. Township of Manalapan*, 47 F.3d 628, 637 (3d Cir. 1995)) (internal quotations omitted).)

In his Reply Brief, Vasquez retorts that "Berks County manifested assent to [] Quigley on its behalf" through promulgated policies, Quigley's statutory duty to report to Berks County thereon, and its awareness of the practices via Quigley's duty to report and the ICC reports. (Vasquez's Reply Br. at 4.)

## 2. Analysis

"[T]he touchstone of the Section 1983 action against a governmental body is an allegation that an official policy, custom[,] or usage is responsible for a deprivation of rights protected by the [United States] Constitution. *Davis v. City of Philadelphia*, 650 A.2d 1127, 1130 (Pa. Cmwlth. 1994) (quoting *Monell*, 436 U.S. at 690). In *Monell*, the United States Supreme Court determined that local governments may be held liable for civil rights violations under Section 1983 based on action taken pursuant to acts or edicts of those who may fairly be said to represent public policy.

In *Hennessy v. Santiago*, 708 A.2d 1269, 1275-76 (Pa. Super. 1998),[23] our sister court, the Superior Court, applied the standard for *Monell* claims enunciated by the Third Circuit in *Andrews v. City of Philadelphia*, 895 F.2d 1469 (3d Cir.

---

[23] Superior Court decisions are not binding on this Court but may be cited for their persuasive value. *Lerch v. Unemployment Comp. Bd. of Rev.*, 180 A.3d 545, 550 (Pa. Cmwlth. 2018).

1998), *superseded in part on other grounds by statute*, Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071.  In *Andrews*, the Third Circuit explained:

> A government entity may not be held liable under [S]ection 1983 under the respondeat superior doctrine.  To obtain a judgment against a municipality, a plaintiff must prove that the municipality itself supported the violation of rights alleged.  Thus, [S]ection 1983 liability attaches to a municipality only when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury.
>
> A government policy or custom can be established in two ways.  Policy is made when a decisionmaker possessing final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict.  A course of conduct is considered to be a "custom" when, though not authorized by law, such practices of state officials are so permanent and well settled as to virtually constitute law.
>
> In either of these cases, it is incumbent upon a plaintiff to show that a policymaker is responsible either for the policy or, through acquiescence, for the custom.

*Id*. at 1480 (quotations, citations, and alterations omitted) (alterations added).

"The question of who is a 'policymaker' is one of state law," asking whether that authority is one to make **final**, unreviewable policy.  *Id.* at 1481.  The Third Circuit stated:

> When an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality.  Similarly[,] when a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with **their** policies.

*Id.* (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (emphasis in original)).

In *Hennessy*, the Superior Court reviewed the grant of a demurrer and dismissal of a *Monell* claim, alleging that Mercer County and the county's assistant administrator made the decision to adopt a policy that led to the appellant's termination, and that this violated the appellant's constitutional rights. The Superior Court held that, at the early procedural stage, the appellant had sufficiently alleged that the assistant administrator was a policymaker whose decision to adopt the policy that led to the appellant's termination was a final policy. *Hennessy*, 708 A.2d at 1275. As such, the Superior Court held that the appellant had not failed to state a claim.

In the present case, examining the allegations, which we accept as true, Vasquez has failed to state a claim against Berks County under *Monell* and the trial court did not err in dismissing that claim. While Vasquez appears to argue that both Quigley and Berks County are indirectly liable under *Monell*, our review of the Amended Complaint shows that he only alleged this claim against Berks County.[24] (*See* Am. Compl. ¶ 50.) Reviewing the Amended Complaint, Vasquez failed to plead that any Berks County policymaker was involved in or aware of any of the alleged unconstitutional policies or customs or that Quigley constituted a policymaker for Berks County. Unlike in *Hennessy*, where there was a specific averment that the assistant administrator was a policymaker with the authority to issue a final policy on behalf of the county, Vasquez did not allege that any Berks County policymaker adopted or made the final decisions regarding the policies or

---

[24] Moreover, *Monell* contemplates claims of liability against a governmental body, not an individual, such as Quigley.

customs at issue or that Quigley had such authority. As such, the trial court did not err in sustaining the PO as to Vasquez's *Monell* claims against Berks County.

### D. Conditions of Confinement Claim Concerning Inadequate Exercise Against Quigley

#### 1. Parties' Arguments

Vasquez argues that the trial court erred in dismissing his conditions of confinement claim concerning inadequate exercise under the Eighth Amendment. Vasquez asserts that exercise deprivation violates the Eighth Amendment "where movement is denied and muscles are allowed to atrophy, the health of the individual is threatened[,] and the state[']s constitutional obligation is compromised." (Vasquez's Br. at 49-50 (citing *Antonelli v. Sheahan*, 81 F.3d 1422, 1432 (7th Cir. 1996); *Peterkin v. Jeffes*, 855 F.2d 1021 (3d Cir. 1988); *French v. Owens*, 777 F.2d 1250, 1255 (7th Cir. 1985)).) Vasquez alleged that, based on a policy adopted and imposed by Quigley,[25] he was forced to take exercise in the early morning hours during winter, with only the standard uniform, a sweater, and crocs to wear, as he was restricted from purchasing thermals. If they were allowed to exercise inside, Vasquez alleged that they would remain shackled and therefore unable to move sufficiently. Vasquez asserts that these conditions effectively rendered exercise to be unavailable. As a result, Vasquez suffered an aggravation to a preexisting injury and had to be put on suicide watch. Accordingly, Vasquez argues that he sufficiently

---

[25] We note that while Vasquez avers that Berks County adopted this policy, (Am. Compl. ¶ 47), as set forth in our *Monell* discussion, there were no allegations as to what Berks County policymaker was involved in that decision.

stated a claim that the conditions of confinement regarding exercise violated the Eighth Amendment.[26]

Appellees retort that, while Vasquez may have alleged a lack of recreation options, he admitted to having a chance to exercise but refused to partake. Moreover, Appellees assert that the restrictions on exercise were reasonable limitations due to his Disciplinary Segregation designation on Delta Unit. Appellees maintain that there is a legitimate penological purpose in security and that limiting outdoor exercise and keeping Delta Unit inmates restrained during indoor exercise opportunities were reasonable and furthered that penological purpose.

2. Analysis

It is well-settled law that "**meaningful recreation** 'is extremely important to the psychological and physical well-being of [] inmates" and that the failure to provide such recreation may violate the Eighth Amendment. *Peterkin*, 855 F.2d at 1031 (quoting *Spain v. Procunier*, 600 F.2d 189, 199 (9th Cir. 1979)) (emphasis added). "Lack of exercise may amount to a constitutional violation where it poses a significant threat to an inmate's physical and mental well-being. For example, lack of exercise may constitute cruel and unusual punishment where movement is denied and muscles are allowed to atrophy." *Platt v. Brockenborough*, 476 F. Supp. 2d 467, 471 (E.D. Pa. 2007) (quotation omitted). Thus, "[a]lthough the **constitution does not require out-of-cell exercise**, the near-total deprivation of the opportunity to

---

[26] Vasquez also argues that Appellees' POs did not address his inadequate exercise claim. However, Appellees' POs specifically stated that "[n]one of the conditions complained of by Vasquez, including, *inter alia*, the mattress restrictions, the limitation on the personal belongings that he was allowed to keep in his cell, **the type of recreation offered to him**, or the food offered to him, amount to an unconstitutional condition of confinement." (POs ¶ 161 (emphasis added).) The Court is satisfied that this statement encompassed a challenge to the legal sufficiency of Vasquez's conditions of confinement claim based on his alleged inadequate exercise.

49

exercise may violate the Eighth Amendment **unless the restriction relates to a legitimate penological purpose**." *Id.* at 472 (citing *Mitchell v. Rice*, 954 F.2d 187, 191-92 (4th Cir. 1992)) (emphasis added).

In the present case, Vasquez argues that he sufficiently stated a claim for inadequate exercise in violation of the Eighth Amendment. We agree in part. Vasquez asserted two bases for his claim – that he was required to wear restraints while engaging in indoor, but outside of his cell, exercise, and that he was not provided with adequate clothing to exercise outside in the winter months and was not allowed to purchase such clothing. On the first basis, Vasquez averred that if he was offered indoor exercise that took place outside of his cell, he was required to be in restraints, which hindered his ability to exercise. Appellees argue, and the trial court agreed, that given the disciplinary status of Vasquez, requiring restraints was rationally connected to a legitimate penological purpose, ensuring safety and security. On this claim, we agree with Appellees and the trial court that a reasonable factfinder would conclude that requiring inmates, like Vasquez, who are assigned to the disciplinary segregation unit, to be restrained while exercising indoors "relates to a legitimate penological purpose." *Platt*, 476 F. Supp. 2d at 472. Thus, Vasquez did not state a claim for a violation of the Eighth Amendment on this ground.

As to the second basis, Vasquez alleged that due to not being provided with adequate clothing for the winter months and not being allowed to purchase adequate clothing, such as thermals, he was unable to exercise during the winter. Vasquez averred that this lack of exercise resulted in physical harm in the form of an aggravation to a preexisting injury and psychological harm that caused him to be placed on suicide watch. At this early stage of the proceedings and accepting Vasquez's allegations as true, *Stone & Edwards*, 616 A.2d at 1063, this Court

concludes Vasquez has sufficiently stated an Eighth Amendment violation claim on this basis.

This Court has acknowledged that "a prisoner [] is not entitled to the clothing of his choice in prison[,] . . . [but i]f . . . the clothing provided to a prisoner is insufficient to protect him from the elements, a constitutional violation could occur." *Bullock v. Horn*, 720 A.2d 1079, 1082 (Pa. Cmwlth. 1998). While this Court, in *Bullock*, sustained a demurrer because the inmate did "not dispute that he receive[d] a coat, hat, footwear, and gloves when he [went] outside during the winter months," *id.*, the clothing provided to Vasquez for the winter months, as pleaded, differ greatly from that provided to the inmate in *Bullock*. Further, although there is no constitutional violation where an inmate is provided the choice to remain in the inmate's cell when the weather is too cold for the clothing provided, *see Smith v. United States*, 432 F. App'x 113, 116 (3d Cir. 2011), Vasquez's allegations do not reflect that he is given the choice to remain inside during the "harsh wintery weather," other than when they are "snowed in" or on "rainy days," which is when the indoor exercise is offered, (Am. Compl. ¶ 10). Finally, unlike Vasquez's claim based on the use of restraints during indoor recreation, it is not clear that a factfinder would conclude that providing inmates with inadequate clothing for winter weather and restricting them from purchasing the same is "relate[d] to a legitimate penological purpose." *Platt*, 476 F. Supp. 2d at 472. *But see Bullock*, 720 A.2d at 1082 (noting, in a case where adequate clothing was provided, that "there is a legitimate interest in withholding clothing from an inmate for security reasons," particularly where the inmate was housed within a restricted housing unit). Thus, if Vasquez is "able to demonstrate sufficiently serious harm as a result of his lack of exercise, and that [Quigley] imposed this harm out of wanton disregard for his health

and well-being, [he] could conceivably prevail on his Eighth Amendment claim." *Platt*, 476 F. Supp. 2d at 472. Accordingly, because Vasquez sufficiently stated a claim for an Eighth Amendment violation based on a lack of exercise opportunities due to inadequate clothing, the trial court erred in sustaining the demurrer on that claim.

### E. Remaining Claims Not Challenged by POs

#### 1. Parties' Arguments

Vasquez argues that Appellees' POs failed to address the following claims: (1) his First Amendment retaliation claims against the remaining Appellees; (2) his failure to protect claims against Quigley, Smith, Phillips, and Castro; (3) his due process claims; and (4) his tort claims. Because Pennsylvania Rule of Civil Procedure 1028, Pa.R.Civ.P. 1028, requires all preliminary objections to be raised at one time, Vasquez asserts that Appellees failure to object to these claims at this time meant they were unchallenged and that the trial court erred in dismissing his entire Amended Complaint.

Appellees do not directly address whether the POs addressed all of the claims but maintain that Vasquez failed to establish a retaliation claim against all Appellees. Further, Appellees do not address Vasquez's contention that the POs do not address his failure to protect claims against Quigley, Smith, Phillips, and Castro. Finally, Appellees assert that Vasquez's due process and related tort claims were derivative claims that could not stand on their own, and, alternatively, Vasquez did not provide separate factual allegations sufficient to establish the elements of those torts. However, Appellees do not assert whether these claims were addressed in the POs.

In his Reply Brief, Vasquez retorts that because "Appellees failed to provide any legal authority to support an argument as to why they chose not to object to" his

retaliation claims against the Appellees beyond Dew and Johnson, failure to protect claims, due process claims, and related tort claims, this Court must consider them waived and that the trial court's dismissal thereof was in error. (Vasquez's Reply Br. at 5.)

2. Analysis

Pennsylvania Rule of Civil Procedure 1028(b) provides that "[a]ll preliminary objections shall be raised at one time." Pa.R.Civ.P. 1028(b). Further, Pennsylvania Rule of Civil Procedure 1032(a) provides that "[a] party waives all defenses and objections which are not presented . . . by preliminary objection." Pa.R.Civ.P. 1032(a). Accordingly, an argument or defense that was not raised in the POs before the trial court is not properly before this Court on appeal.

Our review of the relevant POs shows that Appellees demurred to the following. First, Appellees objected to Vasquez's First Amendment retaliation claims, stating that "Vasquez has failed to plead facts sufficient to support a finding that **any [Berks County Jail] staff members** engaged in retaliatory conduct toward him." (POs ¶ 122 (emphasis added).) While Appellees did not individually list the Appellees against whom Vasquez failed to state a claim, this statement is sufficient to show that the demurrer was objecting to all Appellees who were staff at the Berks County Jail and against whom Vasquez lodged First Amendment retaliation claims. Accordingly, the POs sufficiently stated a demurrer to Vasquez's First Amendment claims against all the individual Appellees, not just Dew and Johnson. Accordingly, Appellees sufficiently stated a demurrer to all of Vasquez's First Amendment retaliation claims, which was sustained by the trial court as to all Appellees. However, because Vasquez only challenged on appeal the dismissal of his First Amendment retaliation claims against Dew and Johnson, Vasquez has waived any

53

argument that the trial court erred in dismissing these other retaliation claims. *Commonwealth v. Johnson*, 985 A.2d 915, 924 (Pa. 2009) (explaining that under Pennsylvania Rules of Appellate Procedure 2101, 2111, and 2119, Pa.R.A.P. 2101, 2111, & 2119, an appellant must develop claims with citation to the record and relevant case law, and a failure to do so will result in waiver.)

Next, the POs addressed Vasquez's failure to intervene/failure to protect claims. The POs stated that Vasquez "failed to show that any of the named [Appellees] had a duty to intervene" or that "any of the [Appellees] had a reasonable opportunity to intervene." (POs ¶¶ 186-87.) While this demurrer appears to focus on Vasquez's claim concerning Dew's failure to intervene in the alleged spit hood incident, it nonetheless referenced all of the Appellees and is sufficient to cover Vasquez's failure to protect claims against Quigley, Smith, Phillips, and Castro. The trial court sustained this PO as to all Appellees, but, because Vasquez only developed his argument as to why the trial court erred in dismissing the claim against Dew, he has waived any arguments as to the other claims. *Johnson*, 985 A.2d at 924.

Finally, a review of the POs reflects no mention of, let alone objection to, Vasquez's due process or tort claims based on a failure to plead sufficient facts. While Appellees now argue that the related tort claims were derivative, and thus could not stand on their own, and that Vasquez did not provide separate factual allegations to support them, these are arguments that were not asserted in their POs and cannot be argued now before this Court on appeal. Pa.R.Civ.P. 1032(a).

Accordingly, given our review of the POs, we agree with Vasquez that Appellees did not assert demurrers, or otherwise object, to his due process and tort claims. Because Appellees failed to raise these issues in their POs, Appellees waived

54

objection to these claims, *id.*, and the trial court erred in dismissing the Amended Complaint as to the unchallenged claims.

## III.    CONCLUSION

In sum, the trial court erred in sustaining Appellees' POs to and dismissing the following of Vasquez's claims:  (1) First Amendment retaliation and failure to intervene against Dew; (2) excessive force against Johnson; (3) conditions of confinement claim concerning inadequate exercise against Quigley; (4) due process claims against all individual Appellees; and (5) tort claims against all individual Appellees.  Accordingly, for the foregoing reasons, the trial court's Order is reversed in part as to these claims and is affirmed in part as to all remaining claims.

---

**RENÉE COHN JUBELIRER,** President Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Ramon Vasquez,                          :
                        Appellant       :
                                        :
            v.                          :   No. 1011 C.D. 2020
                                        :
Berks County, Janine Quigley,           :
Jeffrey Smith, Jay Phillips,            :
Miguel Castro, Stephen Dew,             :
Michael Johnson, Charles Fisher,        :
Dustin Remp, Sgt. Tassone and           :
CO Matta                                :

# O R D E R

**NOW**, June 29, 2022, the March 23, 2018 Order of the Court of Common Pleas of Berks County dismissing Ramon Vasquez's Amended Complaint with prejudice is **REVERSED IN PART** and **AFFIRMED IN PART** in accordance with the foregoing opinion.

_____
**RENÉE COHN JUBELIRER,** President Judge